**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**LEVESTER GILLARD, SR.
ADC #92839**                                                              **PLAINTIFF**

**V.**                              **CASE NO. 5:14-CV-170 JM/BD**

**CONNIE WILKERSON, et al.**                                      **DEFENDANTS**

**RECOMMENDED DISPOSITION**

**I.    Procedures for Filing Objections:**

This Recommended Disposition ("Recommendation") has been sent to Judge

James M. Moody Jr.  Any party may file written objections to this Recommendation

within fourteen (14) days.  If objections are filed, they must be specific and must include

the factual or legal basis for the objection.

If no objections are filed, Judge Moody can adopt this Recommendation without

independently reviewing all of the evidence in the record.  By not objecting, you may also

waive any right to appeal questions of fact.

**II.    Procedural History:**

Plaintiff Levester Gillard, Sr., an Arkansas Department of Correction ("ADC")

inmate, filed this lawsuit *pro se* under 42 U.S.C. § 1983, alleging that both ADC

employees ("ADC Defendants") and medical personnel ("Medical Defendants") acted

with deliberate indifference to his medical needs.  (Docket entry #2)  He also asserts a

state-law negligence claim against the Defendants.

Later, Mr. Gillard moved for summary judgment on all claims raised in this lawsuit.  (#76)  After the ADC Defendants responded to Mr. Gillard's motion, the Medical Defendants moved for partial summary judgment on Mr. Gillard's claims against Defendants Quinones and Kelly.  (#92)  The Medical Defendants also responded to Mr. Gillard's motion for summary judgment.  (#95, #96, #98, #99)

The Court denied Mr. Gillard's motion for summary judgment and granted the Medical Defendants' motion for partial summary judgment.  (#120)  As a result, Mr. Gillard's claims against Defendant Quinones were dismissed, without prejudice, based on his failure to exhaust his administrative remedies.  His claims against Wenoka Kelly were limited to her alleged failure to provide Mr. Gillard an updraft treatment on December 9, 2013.  Mr. Gillard subsequently moved to dismiss his claims against the ADC Defendants.  (#147), which the Court granted.  (#148)

Now pending is Mr. Gillard's motion to amend his complaint (#124), the Medical Defendants' motion for summary judgment (#131), and Mr. Gillard's motion for order (#151).  The Medical Defendants' motion for summary judgment (#131) should be GRANTED, and the remaining deliberate-indifference claims against them should be DISMISSED, with prejudice.  Because the Court recommends that Mr. Gillard's constitutional claims be DISMISSED, the Court should decline from exercising supplemental jurisdiction over Mr. Gillard's state-law negligence claims.

Mr. Gillard's motion to amend his complaint (#124) and his motion for order (#151) should be DENIED.

III.   **Discussion**:

A.   Standard

In a summary judgment, the court rules in favor of a party before trial.  A party is entitled to summary judgment if the evidence, viewed in the light most favorable to the parties on the other side of the lawsuit, shows that there is no genuine dispute as to any fact that is important to the outcome of the case.  FED.R.CIV.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505 (1986).

Here, Medical Defendants have moved for summary judgment, so they must come forward with evidence showing that there is no real dispute about any fact that would make a difference in how the case is decided.  If they meets this burden, Mr. Gillard must produce evidence that contradicts Defendants' evidence.  *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  If he does not come forward with enough evidence to show that there is a real dispute, the Court must grant summary judgment in favor in favor of the Medical Defendants; and there will be no trial.  *Celotex Corp.,* 447 U.S. at 322–23, 106 S.Ct. at 2552.

B.   Deliberate-Indifference Claims

"Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To show that prison officials failed to provide adequate medical

3

treatment, Mr. Gillard must prove "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004).  A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials "ignored an acute or escalating situation or that [these] delays adversely affected his prognosis."  See *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995) (quoting *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995), abrogated on other grounds by *Johnson v. Jones*, 515 U.S. 304 (1995), as recognized in *Reece*, 60 F.3d at 492 (internal quotation marks omitted)).

Mr. Gillard specifically complains that Defendant William Warren did not order a hinged-knee brace as recommended by an orthopedist in a timely manner; that Defendant Marie Austin failed to provide him proper rehabilitation for his knee following surgery in 2011; that Defendant Estalla Bland discontinued his medically prescribed orthopedic shoes; that Defendant Bland failed to refer him to a medical provider for migraine headache treatment; that in March 2013, Defendant Bland required him to climb stairs, despite his "no-stair" script; that Defendant Ojiugo Iko failed to provide proper treatment for his in-grown toenail; that in December 2013, Defendants Connie Wilkerson, Kimberly Linder, and Wenoka Kelly denied him breathing treatments; that Defendant Deborah York was aware that Mr. Gillard was not being provided breathing treatments, but failed to remedy the situation; and that Defendant York, as Health Services Administrator, was "responsible for everything."  (#132-2 at p.25)

4

Based on the evidence presented, the Medical Defendants are entitled to judgment as a matter of law on Mr. Gillard's claims against them.[1]

1.      Dr. William Warren

Mr. Gillard claims that, in August 2011, Dr. Crowell recommended that Mr. Gillard receive a hinged-knee brace.  Mr. Gillard sues Defendant Warren because he did not provide Mr. Gillard the hinged-knee brace until February of 2012.  (#132-2 at p.7)

On July 1, 2011, Dr. Crowell (not a party to this lawsuit) surgically repaired Mr. Gillard's right patella.  (#132-1 at p.18)  The same day, Mr. Gillard returned to the Cummins Unit and received a wheelchair script, Tramadal, and extra pillows so that he could elevate his leg.  (#132-1 at p.19)

On July 2, 2015, Mr. Gillard complained that he was in great pain and had fallen.  (#132-1 at p.21)  Defendant Warren prescribed Toradol injections and Phenergan.  (*Id.*)

The next day, Mr. Gillard again complained that he was still in great pain.  Mr. Gillard was provided Tylenol #3.  (*Id.*)

On September 15, 2011, Mr. Gillard returned to the infirmary complaining of knee pain.  Mr. Gillard was advised to continue taking Tylenol #3.  He was scheduled to be examined at the orthopedic clinic at the end of the month.  (*Id.* at p.24)

---

[1] In his response to the Defendants' motion for summary judgment, Mr. Gillard includes allegations relating to his medical treatment following his knee surgery in 2012. Because Mr. Gillard did not include those claims in his original or amended complaints, they will not be addressed in this Recommendation, nor should they be considered in ruling on the Defendants' motion.

On September 28, 2011, Mr. Gillard underwent an x-ray examination of his right knee. (*Id*. at p.25)  The x-ray revealed no fracture or dislocation, a normal alignment, and swelling without acute bone abnormality. (*Id*.)

On October 10, 2011, Defendant Warren examined Mr. Gillard and ordered him high-top tennis shoes, as prescribed by Dr. Crowell. (*Id*. at p.26)  In addition, Defendant Warren requested a consult for Mr. Gillard to be examined by Dr. Crowell.  That consultation was approved, and Mr. Gillard was scheduled to be seen by Dr. Crowell on October 13, 2011. (*Id*.)

On November 4, 2011, Mr. Gillard again returned to the infirmary complaining of knee pain. (*Id*. at p.30)  The sick-call nurse instructed Mr. Gillard to take Tylenol #3 and referred him to a physician. (*Id*.)

On November 9, 2011, an orthopedic surgeon examined Mr. Gillard. (*Id*.)  The following day, Defendant Warren requested that Mr. Gillard have a four-week check-up with Dr. Crowell for a right patellar tendon repair. (*Id*. at pp.31-32)  Dr. Anderson (not a party to this lawsuit) denied Defendant Warren's consult request. (*Id*. at p.32)

On December 21, 2011, Defendant Warren examined Mr. Gillard and ordered the hinged-knee brace "as per [] Crowell's note in Aug." (*Id*. at p.33)  While waiting for the hinged-knee brace to arrive, Defendant Warren ordered Mr. Gillard a knee-sleeve to be used for support. (*Id*.)  On December 28, 2011, Mr. Gillard received the knee-sleeve. (*Id*. at p.34)

On January 4, 2012, Defendant Warren examined Mr. Gillard and again requested that Mr. Gillard be examined by Dr. Crowell.  (*Id*. at p.35)  Defendant Warren also noted that Mr. Gillard needed a "no stairs script."  (*Id*.)

In January and February 2012, Mr. Gillard was examined by Dr. Crowell and underwent an x-ray and MRI.  (*Id*. at pp.37-41)  At the end of February 2012, Defendant Warren again requested that Mr. Gillard be examined by Dr. Crowell.  (*Id*. at p.42)

On March 22, 2012, Defendant Austin observed Mr. Gillard carrying his prescribed knee brace rather than wearing it.  (*Id*. at p.43)  According to his deposition testimony, Mr. Gillard had received the brace at issue in February of 2012.  (#132-2 at p.7)

Based on the evidence presented, it is undisputed that Mr. Gillard did not receive the knee brace at issue in August 2011, as recommended by Dr. Crowell.  The Court, however, cannot conclude that such a delay proves that Defendant Warren acted with deliberate indifference to Mr. Gillard's medical needs.

According to Mr. Gillard's medical records, he was regularly examined by Defendant Warren, as well as other medical staff members, following his knee surgery in 2011.  Defendant Warren specifically requested that Dr. Crowell examine Mr. Gillard multiple times; that Mr. Gillard be allowed to receive physical therapy; that Mr. Gillard be issued a no-stairs script, and authorized both a knee sleeve, a knee brace, and orthopedic shoes.  Furthermore, Mr. Gillard underwent multiple x-rays and MRIs in 2012 and 2013, and underwent a second surgery in May 2012.

The delay that Mr. Gillard experienced appears to constitute negligence at most and falls far short of a constitutional claim for relief.  *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010)(plaintiff must show more than even gross negligence; and mere disagreement with treatment decisions does not rise to level of constitutional violation).

In addition, Defendants attach Dr. Robert Floss's declaration to their motion. (#132-1 at pp.1-16)  According to Dr. Floss, Mr. Gillard received appropriate medical care for his knee complaints.  During the course of his treatment, Mr. Gillard underwent numerous x-rays, an MRI, and two surgeries.  In addition, he was provided prescription pain medication and NSAIDs at all times, and was regularly examined by Defendant Warren, Dr. Crowell and Dr. Schock.

Mr. Gillard has failed to provide any evidence that Defendant Warren's delay in providing him a hinged-knee brace resulted in any additional injury.  See *Reece v. Groose*, *supra*.  In the absence of that kind of evidence, Mr. Gillard should not be allowed to move forward on his claim against Defendant Warren.  Defendant Warren is entitled to judgment as a matter of law.

2.     Marie Austin

Mr. Gillard claims that Defendant Austin denied him rehabilitative services after his 2011 knee surgery.  According to Mr. Gillard's deposition testimony, the first time that he heard of any recommendation for physical therapy was in response to a grievance that he filed in December 2011, CU-11-2413.  (#132-2 at p.6; #12 at p.6)

8

According to the Deputy Director's response to Mr. Gillard's grievance, on August 31, 2011, Dr. Crowell recommended that Mr. Gillard receive "physical therapy, quadriceps strengthening." (#12 at p.6) Again, on November 9, 2011, Dr. Crowell recommended continued therapy or quadriceps strengthening. (*Id*.) As a result, Defendant Warren submitted a consult for physical therapy and a follow-up appointment with Dr. Crowell. (*Id*.) Although Dr. Anderson (not a party to this lawsuit) approved the follow-up appointment, he denied Defendant Warren's request that Mr. Gillard receive physical therapy. (*Id*.) Dr. Anderson explained that physical therapy was not medically necessary because Mr. Gillard had not tried the "home program." (#132-1 at p.32) Dr. Anderson recommended quadricep exercises and noted that Mr. Gillard's progress should be monitored. (*Id*.)

On January 4, 2012, Mr. Gillard was examined by Defendant Warren. (#132-1 at p.35) Defendant Warren noted that Mr. Gillard's knee had improved and that he was able to almost fully extend his right knee. (*Id*.) Defendant Warren, however, stated that he was puzzled why Dr. Anderson had determined that physical therapy was not appropriate because Mr. Gillard had "been doing appropriate exercises." (*Id*.)

Again, according to Dr. Floss, Mr. Gillard received adequate medical treatment for his knee. In addition, based on a review of Mr. Gillard's medical records, it does not appear that Defendant Austin ever provided any medical treatment to Mr. Gillard. (*Id*. at p.7) More importantly, as Health Services Administrator, Dr. Floss explained that Defendant Austin lacked the authority to override any decisions made by Mr. Gillard's

treating physicians.  (*Id*.)  As a result, Defendant Austin also is entitled to judgment as a matter of law on Mr. Gillard's claims against her.

    3.    Estella Bland

Mr. Gillard claims that Defendant Bland acted with deliberate indifference to his medical needs by: discontinuing his prescription for orthopedic shoes in January 2013; delaying referring him to a provider to treat his migraine headaches; and requiring him to climb stairs to receive treatment in March 2013, despite his "no stairs" script.

    a.    Orthopedic Shoes

Based on Mr. Gillard's medical records, on January 23, 2013, Defendant Bland examined Mr. Gillard.[2]  (#132-1 at p.61)  At that time, Mr. Gillard requested a more stable pair of tennis shoes because his footwear was insufficient to accommodate his exercise routine.  According to Defendant Bland, Mr. Gillard explained that his mother had given him a pair of tennis shoes, but that he did not want to "wear out" those shoes "trying to exercise."[3]  *Id*.  Defendant Bland also noted that Mr. Gillard refused to allow

---

[2] It is undisputed that, on October 20, 2011, Defendant Warren issued Mr. Gillard a prescription for high-top tennis shoes and that Mr. Gillard received the shoes on that same date. (#132-1 at pp.28, 29)  Defendants argue that there is no evidence that those shoes were ever retrieved.  In his deposition, however, Mr. Gillard states that Defendant Bland took his prescription tennis shoes in January 2013. (#132-1 at p.14)  Yet, in his response to the Defendants' motion, Mr. Gillard also explains that only his "script" was taken in January 2013. (#141 at p.2)  Accordingly, although this fact remains in dispute, it does not preclude summary judgment in favor of Defendant Bland on this claim.

[3] Mr. Gillard also contests this fact in his response to the Defendants' motion for summary judgment.  (#145 at p.4)  Again, this disputed fact does not preclude a ruling in

her to assess his feet to determine his need for appropriate footwear.  (*Id.*)  He explained that the footwear was not needed to address any problem that he had with his feet; rather, Mr. Gillard informed Defendant Bland, the more substantial footwear was needed to accommodate the pain in his back and his knees.  Defendant Bland noted that there was no indication of a need for prescription footwear at that time.

On May 8, 2013, Mr. Gillard attended sick-call and requested that his tennis shoe script be renewed.  (*Id.* at p.60)  On May 20, 2013, although Defendant Warren renewed Mr. Gillard's no-shave script, he noted that "the issues of tennis shoes was addressed previously by Defendant Bland."  (*Id.*)

On June 19, 2013, Defendant Bland examined Mr. Gillard.  (*Id.* at p.61)  She noted that Mr. Gillard had a pair of infirmary-issued tennis shoes.  (*Id.*)  She explained that the shoes had not been retrieved and would not be replaced.  (*Id.*)  In addition, she referenced Dr. Schock's order dated May 22, 2013, where Dr. Schock had noted that Mr. Gillard's shoes were "worn out, rec[.] replacement."  (*Id.* at p.56)  Defendant Bland, however, explained that "this inmate currently does not have prescribed tennis shoes to be replaced."  (*Id.* at p.61)

In October 2013, Mr. Gillard was transferred to the Varner Super Max Unit. (*Id.* at p.63)  At that time, Defendant Iko examined Mr. Gillard.  (*Id.* at p.63)  After examining Mr. Gillard, Defendant Iko concluded that there was no indication for medically

_____

favor of Defendant Bland on this claim.

prescribed shoes, and that Mr. Gillard should wear "any footwear [] provided by [the] ADC."  (*Id*.)  Although Mr. Gillard continued to request prescription tennis shoes, those requests were consistently denied.

Based on the evidence presented, the Court cannot conclude that Defendant Bland acted with deliberate indifference to Mr. Gillard's medical needs by refusing to provide him a prescription for orthopedic shoes.  Mr. Gillard has failed to offer any evidence that he experienced any additional injury as a result of having to wear other tennis shoes.[4]  Dr. Floss also testified that orthopedic shoes are distributed based on a clinical need, and that he agreed with Defendant Bland's refusal to renew Mr. Gillard's orthopedic-shoe script after her evaluation of Mr. Gillard.  Finally, Defendant Iko also refused to issue Mr. Gillard orthopedic shoes after conducting an assessment of his feet.  Mr. Gillard cannot create a material dispute of fact simply by disagreeing with the treatment that he was provided.

b.     "No Stairs" Script

Mr. Gillard also alleges that Defendant Bland acted with deliberate indifference to his medical need when she required him to climb stairs to receive treatment on one occasion, despite Mr. Gillard's "no stairs" script.

---

[4] In his response to the Defendants' motion, Mr. Gillard explains that because he was not provided orthopedic shoes, his "knee is in worse shape than before."  (#145 at p.4) He offers no evidence, however, to support this statement.

Mr. Gillard underwent a second knee surgery in May of 2012. (#132-1 at p.47)

On March 25, 2013, Mr. Gillard climbed the stairs to attend sick call. (#132-2 at p.12)

He was assisted up the stairs by two security guards, one under each arm. (*Id*. at pp.11-

12)  During his deposition, when Mr. Gillard was asked whether he could have gone up

the stairs keeping his right leg straight and using only his left leg, going one leg at a time,

he replied that he "could have."  (*Id*. at p.13)

Based on this evidence, Mr. Gillard should not be allowed to proceed on this claim

against Defendant Bland.  Although it is undisputed that on one occasion Mr. Gillard used

the stairs despite his "no stairs" script nearly a year after he underwent surgery, it is also

undisputed that two security guards assisted him, and that he could have climbed the

stairs by himself.  While the conduct might be considered negligent, it does not constitute

deliberate indifference.  See *Langford v. Norris*, *supra*.

    c.    Migraine-Headache Treatment

Based on Mr. Gillard's medical records, on June 11, 2012, Defendant Bland

examined him.  On that date, Mr. Gillard stated "I have this knot on the back of my head.

I want something done about it []."  (#132-1 at p.49)  After Defendant Bland explained

that treatment was not indicated for the lipoma, security officers escorted Mr. Gillard out

of the infirmary.  (*Id*.)

On July 13, 2012, Defendant Bland again examined Mr. Gillard based on his

complaints of headaches.  (*Id*. at p.70)  During this encounter, Mr. Gillard informed

Defendant Bland that his headaches were caused "from this cyst on my head."  (*Id*.)  At

that time, Defendant Bland prescribed migraine medication and informed Mr. Gillard that the removal of the lipoma, which Mr. Gillard referred to as a cyst, was cosmetic and did not require treatment.  (*Id.*)

On August 27, 2012, Defendant Bland again examined Mr. Gillard due to his headache complaints.  (#132-1 at p.72)  Again, Defendant Bland prescribed Mr. Gillard migraine medication and explained that his lipomas were cosmetic.  (*Id.*)  She, however, referred Mr. Gillard to Dr. Moore for an examination of his lipomas.  (*Id.*)

On September 20, 2012, Dr. Moore (not a party to this lawsuit) examined Mr. Gillard.  (#132-1 at p.74)  Dr. Moore noted that the mass on Mr. Gillard's head was consistent with lipoma, and that there was no tenderness to the surrounding tissue or any sign of infection.  (*Id.*)  Dr. Moore recommended continued observation of the lipoma over excision and increased Mr. Gillard's prescription for Nortriptiline to 50 milligrams.  (*Id.*)  Dr. Moore also noted that if the lipoma continued to grow, steroid injections could be used to shrink the lipoma.  (*Id.*)

On October 8, 2012, Defendant Bland examined Mr. Gillard due to his request for removal of the lipoma.  (#132-1 at p.76)  Mr. Gillard complained that he continued to have headaches and the Nortriptiline was not providing sufficient relief.  (*Id.*)  Defendant Bland requested that Mr. Gillard be referred for an examination by Dr. Moore within ten to fourteen days.  (*Id.*)

On November 27, 2012, Dr. Moore examined Mr. Gillard.  (#132-1 at p.77)  Mr. Gillard again complained of throbbing headaches and attributed his migraines to the cyst

14

on the back of his head.  (*Id*.)  Dr. Moore explained why the lipoma was unlikely to be the source of his migraine headaches.  He suggested that Mr. Gillard be seen in four weeks for a follow-up visit, or sooner if the headaches worsened.  (*Id*.)

On February 8, 2013, Dr. Moore again examined Mr. Gillard based on his migraine complaints.  (#132-1 at p.79)  Dr. Moore prescribed 25 milligrams of Sumatriptan at the onset of a migraine headache, and up to 200 milligrams of Sumatriptan within a twenty-four hour time period.  (*Id*.)

On March 25, 2013, Defendant Bland again examined the cyst on Mr. Gillard's head.  (*Id*. at 80)  Defendant Bland noted that the occipital lipoma had not changed since Mr. Gillard's last visit to the infirmary and that he was scheduled for an evaluation of the cyst.  (*Id*.)   Mr. Gillard was instructed to continue NSAIDs as prescribed.  (*Id*.)

Based on this undisputed evidence, the Court cannot conclude that Defendant Bland acted with deliberate indifference to Mr. Gillard's migraine headaches.  Rather, the evidence shows that Defendant Bland consistently recommended that Mr. Gillard be examined by Dr. Moore for treatment.  Although Mr. Gillard experienced some delay in seeing Dr. Moore, according to Dr. Floss, Defendant Bland was not the individual responsible for scheduling Mr. Gillard's appointment with Dr. Moore.  Rather, that duty would have been assigned to a medical records or scheduling nurse/clerk.  (*Id*. at p.9) Furthermore, in Dr. Floss's opinion, Mr. Gillard received the appropriate treatment for his migraine headaches.

Mr. Gillard has not come forward with any evidence creating a genuine issue of material facts on this issue.  Although Mr. Gillard plainly disagreed with the treatment that he was provided, his disagree does not rise to the level of a constitutional claim for relief.

      4.      Dr. Ojiugo Iko

Mr. Gillard alleges that Defendant Iko failed to provide him adequate medical treatment for his ingrown toenail.  Even assuming that Mr. Gillard's ingrown toenail constituted a "serious medical need," Defendant Iko is entitled to judgment as a matter of law on this claim.

According to Mr. Gillard, Defendant Iko first examined him on December 29, 2013, to treat his ingrown toenail.  (#145 at p.6)  At that time, Mr. Gillard claims, Defendant Iko explained that she did not "do in grown toenails."  (#132-2 at p.17; #145 at p.6)

According to Mr. Gillard's medical records, on January 6, 2014, Defendant Iko examined Mr. Gillard for complaints of lower back pain and toe pain after Mr. Gillard removed an ingrown toenail.  (#132-1 at p.82)  Defendant Iko noted that Mr. Gillard's toenail was inflamed and had an odorous discharge.  (*Id.*)  Defendant Iko prescribed Mr. Gillard a topical antibiotic and suggested that he wear warm foot socks, as needed.  (*Id.*)

On January 13, 2015, Mr. Gillard reported to sick call due to complaints of an ingrown toenail on his right large toe.  (#132-1 at p.84)  At that time, Mr. Gillard explained that he thought he had "taken care" of the problem by "digging" the nail out,

but that it was still causing him pain.  (*Id.*)  The examining nurse noted that there was no redness or discharge, although the toe was tender.  (*Id.*)

On January 24, 2014, Mr. Gillard was again seen in sick call for his ingrown toenail.  (#132-1 at p.85)  Mr. Gillard complained that his pain medication was not providing sufficient relief and that the infection was spreading.  (*Id.*)  The nurse noted that there was inflamation to the toe and minimal bleeding.  (*Id.*)  Mr. Gillard was referred to the provider and instructed to keep the toe clean and dry.  (*Id.*)

On February 11, 2014, Mr. Gillard was seen in sick-call again for complaints of toe pain.  (*Id.* at p.86)  The examining nurse noted that the toe was red, but that there was no other sign of infection.  (*Id.*)  Mr. Gillard was again referred to the provider.  (*Id.*)  The nurse also provided Mr. Gillard a prescription for "foot soaks" until he could be seen by the provider.  (*Id.*)

On February 14, 2014, APN Griswold examined Mr. Gillard and noted that, although his toe was swollen and red, he ambulated without difficulty.  (*Id.* at p.87)  Mr. Gillard was again referred to a provider.  On March 21, 2014, Mr. Gillard's toe nail was removed without difficulty.[5]  (*Id.*)

---

[5]  In their statement of undisputed facts, Defendants explain that Mr. Gillard's toenail was removed on April 11, 2014.  (#132 at p.9)  The addendum to Mr. Gillard's medical records entered by Nurse Grisswold on April 11, 2014, however, notes "[t]oenail removed from right great toe on 03/21/2014 without difficulty.  Inmate tolerated well, no additional c/o or requests."  (#132-1 at p.87)

Although Mr. Gillard experienced a significant delay in having his toenail removed, the Court cannot conclude that Defendant Iko acted with deliberate indifference to his medical needs.  Even after allegedly informing Mr. Gillard that she did not "do ingrown toenails," Defendant Iko prescribed Mr. Gillard prescription ointment to treat the ingrown toenail, and Mr. Gillard was regularly examined by medical personnel. Furthermore, based on the record before the Court, it does not appear that Defendant Iko was responsible for scheduling Mr. Gillard's follow-up examinations or treatment. Therefore, even if Defendant Iko's conduct could be considered negligent or unprofessional, there is no evidence that she intentionally disregarded Mr. Gillard's medical needs.[6]

   5.    Defendants Wilkerson, Linder, and Kelly[7]

Mr. Gillard alleges that Defendants Wilkerson, Linder, and Kelly denied him breathing treatments in December of 2013.  In his deposition, he testifies that, although medical personnel explained that only one updraft machine was working correctly during this time period, he did not believe that the ADC possessed only one updraft machine to treat all ADC inmates.  (#132-2 at p.22)

_____

   [6] In his affidavit, Dr. Floss also discusses whether Defendant Iko acted with deliberate indifference in failing to provide Mr. Gillard a two-strap knee brace. According to Mr. Gillard's deposition testimony, however, he only sues Defendant Iko based on her failure to timely treat his ingrown toenail.  (#132-1 at pp.20-21)

   [7] The Court notes that Mr. Gillard's claims against Defendant Kelly are limited to her failure to provide him a breathing treatment on December 9, 2013.  (#120)

On November 24, 2013, Mr. Gillard went to the infirmary complaining of asthma-related chest pain.  (#132-1 at p.89)  Nurse Watt examined Mr. Gillard and noted that he suffered from a slight wheeze, although his respirations were even and not labored.  (*Id*.)  Mr. Gillard was referred to the provider.  (*Id*.)

On December 3, 2013, Defendant Iko examined Mr. Gillard and noted that Mr. Gillard was "ill looking," but she did not note any respiratory distress.  (*Id*. at p.90)  Defendant Iko prescribed Mr. Gillard Amoxicillin/Clavulanate, an Ipratroprium inhaler, and nebulizer breathing treatments.  (*Id*.)  In addition, Defendant Iko provided Mr. Gillard a breathing treatment during that visit.  (*Id*.)

On December 8, 2013, Defendant Kelly provided Mr. Gillard a breathing treatment.  (*Id*. at p.91)  Later that day, Mr. Gillard attended sick-call.  The examining nurse noted that Mr. Gillard had wheezing in both lungs and was coughing.  (*Id*.)  The nurse noted that Mr. Gillard would receive his updraft treatment later that day, and referred him to the physician.

On December 14, 2013, Defendant Iko examined Mr. Gillard due to his complaints of wheezing and difficulty breathing.  (*Id*. at p.92)  Defendant Iko recommended that Mr. Gillard continue on the nebulizer treatment for one week.  (*Id*.)  On that date, Mr. Gillard received the nebulizer updraft treatment in the clinic.  (*Id*.)  On December 17, 18, 24, and 25, Defendant Wilkerson administered the updraft treatment to Mr. Gillard.  (*Id*. at pp.92-94)

19

It is undisputed that in December of 2013, Mr. Gillard received updraft treatments, but did not receive the number of treatments prescribed.  During the next month, however, Mr. Gillard did not return to the infirmary with any asthma-related complaints, indicating that this issue had resolved.  In addition, it is undisputed that Mr. Gillard had an inhaler "on person" that he could use at any time.

Based on this evidence, Mr. Gillard should not be allowed to proceed on his claims against Defendants Wilkerson, Linder, and Kelly.  Although Mr. Gillard may have not received the treatment prescribed, he has failed to present any evidence that these Defendants acted with reckless disregard to his health, or that his condition worsened as a result of their conduct.  The conduct of these Defendants could arguably constitute negligence, it does not rise to the level of deliberate indifference.

6.     Defendant York

Mr. Gillard alleges that, through the grievance process, Defendant York was aware that he was not receiving his breathing treatments as prescribed, but failed to remedy the problem.  He sued Defendant York because, as Health Services Administrator, she was "responsible for everything."  (#132-2 at p.25)  In addition, in his response to the Defendants' motion, he explains that she was the individual responsible for providing inadequate medical equipment at the Varner Super Max Unit.

For reasons discussed, Mr. Gillard has failed to state a claim relating to the Defendants' failure to provide him breathing treatments as prescribed.  So to the extent

Mr. Gillard sues Defendant York based on her conduct related to his failure to receive those treatments, this claim also cannot move forward.

Furthermore, Mr. Gillard cannot hold Defendant York liable based on her supervisory position. In a § 1983 action, a supervisor may not be held vicariously liable for the constitutional violations of a subordinate on a respondeat superior theory. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009); *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010); see also *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (holding that the "general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support [§ 1983] liability"). Thus, a prisoner "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S.Ct. at 1948.

A prison supervisor can be held liable if she fails to properly supervise her subordinates by tacitly authorizing a constitutional violation or failing to take corrective action in response to such a violation. See *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995); *Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). But, to state a valid failure-to-supervise claim, a prisoner must allege that the prisoner supervisor had notice of a pattern of unconstitutional acts committed by her subordinates; showed deliberate indifference to, or tacit authorization of, the offensive acts; failed to take appropriate remedial action; and that the failure to supervise caused the prisoner injury. *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010); *Otey v. Marshall*, 121 F.3d 1150, 1156 (8th Cir. 1997). A "single incident, or series of isolated incidents, usually provides an insufficient

basis upon which to assign supervisor liability." *Lenz v. Wade*, 490 F.3d 991, 995-96 (8th Cir. 2007).

Here, Mr. Gillard has failed to allege, or produce any evidence, establishing a failure-to-supervise claim against Defendant York. For this reason Defendant York is entitled to judgment as a matter of law.

D.     Mr. Gillard's Motion to Amend his Complaint

Before Defendants moved for summary judgment on Mr. Gillard's claims against them, Mr. Gillard moved to amend his complaint to include additional allegations against Defendants Austin and Warren. (#124) In his motion, he explains that these Defendants were aware that Mr. Gillard had "orders" for ten days of bed rest following his knee surgery on July 1, 2011. He claims that the due to the "deliberate indifference" of these Defendants, he re-injured his knee on July 2, 2011. On that date, Mr. Gillard alleges, he attempted to get out of bed without crutches or a wheelchair and fell.

Based on the allegations set out in Mr. Gillard's motion, he fails to state that these Defendants were in any way involved in the July 2, 2011 incident or that either of these Defendants knew that he had attempted to get out of bed without assistance. Mr. Gillard's fall is best categorized as an accident, and the Court cannot conclude that the conduct of these Defendants add up to anything more than possible negligence. As a

result, allowing Mr. Gillard to amend his complaint to include this claim would be futile, and the motion (#124) is DENIED, as moot.[8]

E.    Mr. Gillard's Motion for Order

Mr. Gillard recently filed a motion for order requesting injunctive relief.  (#151) He claims that Defendant Bland continues to retaliate against him for filing the instant lawsuit by denying him medical treatment.  Mr. Gillard's motion (#151) should be DENIED.

Mr. Gillard has failed to establish that he will suffer irreparable harm absent Court intervention; nor does he specifically state what relief he seeks from the Court.  If Mr. Gillard believes that Defendant Bland retaliated against him, he is not barred from pursing that claim in a separate lawsuit.

**IV.    <u>Conclusion</u>:**

The Court recommends that the Medical Defendants' motion for summary judgment (#131) be GRANTED, and that Mr. Gillard's remaining deliberate-indifference claims be DISMISSED, with prejudice.  Because the Court recommends that Mr. Gillard's constitutional claims be DISMISSED, the Court also recommends that Judge Moody decline exercising supplemental jurisdiction over Mr. Gillard's state-law negligence claims.  Those claims, however, should be DISMISSED, without prejudice.

---

[8]  The Court notes that Mr. Gillard includes these allegations in his response to the Defendants' motion for summary judgment.  (#141 at pp.1-2)

23

In addition, Mr. Gillard's motion to amend (#124) and his motion for order (#151) should be DENIED.

DATED, this 19th day of October, 2015.


_____
UNITED STATES MAGISTRATE JUDGE